96 CR 1442-J

## CITATIONS

FILED

09 AUG 21 PM 1:03

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

**NUNC PRO TUNC**

AUG 17 2009

### Supreme Court

**Brady v. Maryland**, 373 US 83 (1963)

**Strickler v. Greene**, 527 US 263, 281—82 (1999)

**Kyles V. Whitley**, 514 US 419, 435 (1995)

**Giglio v US**, 405 US 150 154—55 (1972)

**US v. Bagley**, 473US 667, 676 ((1985)

**Youngblood v. West Virginia**, 547 US 867, 869-70)

**US v. Dominguez-Benitez**, 542 US 74, 83 n.9 (2004)

**Moore v. Illinois**, 408 US 786, 794-95)

**Crawford v. Washington**, 541 US 36 (2005)

**Strickland v. Washington,** 466 US 668, 687 (1984)

### Circuit Courts

**Silvav. Brown**, 416 F3d. 980 985-86 (9th. Cir. 2005)

**Carriger v. Stewart**, 132 F3d 463, 479—80 (9th. Cir. 1997)

**US v. Blanco**, 392 F3d 388 (9th. Cir. 2004)

**US v. Wood**, 57 F3d. 733, 737 (9th.Cir. 1995)

**Benny v. Lambert**, 283 F3d 1054—60 (9th. Cir. 2002)

**Thomas v. Goldsmith**, 979 F2d. 746, 749—50 (9th. Cir. 1992)

**Broam v. Brogan**, 320 F3d. 1023, 1030 (9th. Cir. 2003)

**Riggs v. Fairman**, 399 F3d. 1179, 1183 (9th.. Cir. 2005)

**US v. Brooks**, 966 F2d. 1500 (D.C. Cir. 1992)



**US v. Auten**, 632 F2d. 478, 481 (5th. Cir. 1980)

**Carey v.Duckworth**, 738 F2d. 875, 878 (7th. Cir. 1984)

**Lord v. Wood**, 184 F3d. 1083, 1093 (9th. Cir. 1999)

**Hart v. Gomez**, 174 F3d 1067, 1070 (9th. Cir. 1999)

**Tucker v. Ozmint**, 350 F3d. 433, 444 (4th. Cir 2003)

**Sanders v. Ratelle**, 21 F3d. 1446, 1457 ((th. Cir. 1994)

**US v. Smith—Baltiher**, 424 F3d 913, 925—26 (9th. Cir. 2005)

**US v. Coades**, 549 F2d. 1303 (9th. Cir. 1977)

**US v. Harris**, 543 F2d 1247, 1252—53 (9th. Cir. 1976)

**US v. Harrison**, 524 F2d. 421 (9th. Cir. 1975)

## CITATIONS

**Other Sources**

**American Jurisprudence §724**

**Federal Habeas Corpus Practice and Procedure**, §21.2 Rules of Evidence

Alfred Koonin 76477-198
Federal Correctional Institution
3600 Guard Road
Lompoc, CA 93436

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| Alfred Koonin | } | CASE#3:96-cr-01442-J-3 |
| Petitioner/Defendant | } | |
| v. | } | PETITIONER'S REPLY AND |
| U.S.A. | } | MEMORANDUM OF POINTS AND |
| Respondent/Plaintiff | } | AUTHORITIES IN RESPONSE TO |
| | } | UNITED STATES' OPPOSITION TO |
| | } | DEFENDANT'S MOTION PURSUANT |
| | } | TO 28 U.S.C. §2255 |

## SUMMARY OF REPLY BRIEF ARGUMENT

Petitioner hereby replies to Respondent's opposition as is set forth
below. The fact that Petitioner does not address the argument made by
government counsel on all points is not indicative of either waiving
or any acknowledgement of the merits of the government counsel's
position. Rather, it is because Petitioner relies on his argument made
in his opening memorandum, and Petitioner will revisit only those
points which he believes are in rebuttal to the government's position,
and which may be helpful to the Court.

## I
## DESTRUCTION OF THE GUN VIOLATED DUE PROCESS

The government has proclaimed throughout the proceedings of this case
that the Petitioner supplied Nebiolo (the hitman) with the
weapon used in this crime, yet, in their response, the government
glosses over the value of the gun as evidence with a cursory comment
that states that "the gun was not destroyed at the request of or by
the Federal Government, and there was no evidence in the record that
the destruction was done in bad faith. Further, the gun was of no
exculpatory value." (ROB pp.13 line 2-4).

1

This statement is disingenuous. Without examining the gun, what evidence did the government have that it was of no exculpatory value? The answer is, none. At no time is any evidence shown to prove that the gun had no exculpatory value.

AUSA Harrigan did know, however, that the gun had evidentiary value as Nebiolo's statement that Petitioner gave him the gun is why AUSA Harrigan brought this case against Petitioner in the first place.

In Mr. Harrigan's initial interrogation of Petitioner in January, 1998 (see **Attachment 1**) the first comments said to the Petitioner was that Nebiolo had accused Petitioner of giving him the gun. This was the crux of that interview. This, by itself, does not determine the value of the gun as exculpatory evidence, but it does show that the gun was central to the issue.

In his opposition, the prosecutor mentions Det. Anning who collected and photographed the evidence on Feb. 23, 1996, the day of the shooting. (ROB pp.12 n.4). Det. Anning was not an expert witness. He collected, photographed and catalogued the evidence found at the scene. He did not witness the crime, nor did he see who left the gun at the scene. He did not test the gun for recent firing or for ballistics. Nor did he test it for fingerprints. All he could say is that he found a specific weapon at a specific location at a specific time, and he bagged it and tagged it. His job was not to come to any conclusions. Four casings and two unfired cartridges were also found. As this gun holds seven (7) bullets in the clip and one in the chamber, two bullets were unaccounted for as the gun was empty. As it must be presumed that Nebiolo (a so-called professional) would not do a job with a partially loaded weapon, the two missing bullets should have alerted the authorities that this may not have been the weapon used, but merely a "throw down" to put police off the scent. Nebiolo made reference to this plan to confuse the police in his confession. (See **Attachment 2**).

No description of any identifying marks on the gun (other than the

2

serial number) were noted. No ballistics tests were done to determine whether this was, in fact, the gun that fired the bullets found.

The only other investigation on the gun done by SDPD was to test for fingerprints. These were found on the gun and shown not to belong to Nebiolo.

The prosecutor knew of the presence of the fingerprints because at that first interview he told the Petitioner that fingerprints found on the gun **may** belong to the Petitioner. Neither he nor the FBI asked Petitioner for fingerprints at the time. This was unnecessary however, because the Petitioner being an immigrant and naturalized citizen, already had had his prints on record. By the time the Petitioner's trial came up, it was known that these prints did not belong to the Petitioner.

Finding these fingerprints on the gun that belonged to neither the shooter (Nebiolo) nor the Petitioner gives this weapon exculpatory value in the instant case. It contradicts the statement by the prosecutor.

At trial, the prints were not mentioned by defense counsel. If this was because he was not aware of their existence, that indicates prosecutorial misconduct. If he did know of their existence then it indicates ineffectual counsel. Either way, the Petitioner was denied due process.

The Petitioner's appellate attorney had no knowledge of the presence of fingerprints, and their existence was not presented to the Appellate Court. If they were, the Appellate Court would have ruled differently on the Brady issue because these prints give the gun exculpatory value.

In the government's opposition the prints are glossed over without much mention other than they did not match Nebiolo's. (ROB pp.23 line 21—22).

3

The presence of these prints give the gun exculpatory value because had this fact been presented to the jury, the trial could have run a different course.

The Petitioner has denied ever giving Nebiolo a gun. This important fact plus other evidence points to the fact that the Petitioner is telling the truth. This other evidence includes witnesses who saw Petitioner's gun prior to the theft of the weapon in question and who can verify that it was non-functioning. (See **Attachment 5**). Also, a statement from a witness in South Africa (Mary Behr) who witnessed Abel giving Nebiolo money with which to purchase a specific weapon. (See **Attachment 6**).

With the gun having exculpatory value, the prosecutor no longer has any excuse for not preserving it. He had three (3) years to secure the gun and must have known that if unclaimed, SDPD would ultimately destroy it. Not only was this a dereliction of duty on the part of the prosecutor but it was also an act in bad faith.

**Brady v. Maryland**, 373 US 83 (1963) states that, "The suppression by the prosecution of evidence favourable to and requested by an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecutor.

Elements of Brady are:
1. Evidence in question is favourable to the accused in that it is exculpatory or impeachment evidence; 2. The government **willfully or inadvertently** suppresses this evidence, and 3. Prejudice ensues from the suppression (i.e. the evidence is material). (See **Silva v. Brown, 416 F3d. 980, 985-86 [9th. Cir. 2005]; Strickler v. Greene, 527 US 263, 281–82 [1999]; Kyles v. Whitley, 514 US 419, 435 [1995]**).

The prosecutor's duty to disclose exculpatory evidence includes infor-mation that the defense could use to impeach government witnesses. (See **Giglio v. U.S., 405 US 150, 154-55 [1972]; US v. Bagley, 473 US**

4

667, 676 [1985]). Impeachment evidence as well as exculpatory evidence falls within Brady rule. (**Kyles** **(supra) at 437**).

Prosecution's **Brady** obligations include not only duty to disclose exculpatory information, but also duty to search all possible sources for such information. (**US v. Brooks**, **966 F2d. 1500 [D.C. Cir. 1992]**).

Government's duty under Brady arises regardless of whether the defendant specifically requests the favourable evidence (**US v. Bagley**, **473 US 667, 682 [1985]**), or not. (**US v. Blanco**, **392 F3d. 388 [9th. Cir. 2004]**). Similarly, the disclosure requirements set forth in **Brady** apply to a prosecutor even when the knowledge of the exculpatory evidence is in the hands of another prosecutor. (See **Gigilo v. US**, **405 US 154 [1972]**). "The prosecutor's office is an entity and as such it is the spokesman for the government."

"**Brady** suppression occurs when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor.'" (See **Youngblood v. West Virginia**, **547 US 867, 869-70 [2006] [per curium]**). Exculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor does not have it, where an investigatory agency does. (**Kyles v. Whitley**, **514 US 418, 419 [1995]**).

Moreover, as the 9th Circuit has previously noted: actual awareness (or lack thereof) of exculpatory evidence in the government's hands…is not determinative of the prosecution's disclosure obligations.

Rather, the prosecution has a duty to learn of any exculpatory evidence known to others acting on the government's behalf. Because the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know, but could have learned. (See **Carriger v. Stewart**, **132 F3d. 463, 479—80 [9th. Cir. 1997]**). The holdings in Carriger drew directly from holdings of the Supreme Court which state that "[i]n order to comply with Brady .... the individual prosecutor

has a duty to learn of any favourable evidence known to the others
acting on the government's behalf in th[e} case, including the
police." (See **Strickler v. Greene**, **527 US at 281 [1991] [quoting
Kyles, 514 US at 437]**).

The prosecution, in the instant case, was well aware of both the gun
and the fingerprints. The prosecution's declaration that the gun was
not exculpatory was pure speculation. The government had control of
this case from March, 1996 (3 weeks after the crime was committed).
The gun was destroyed around the beginning of 2000, nearly four (4)
years later. Dates on the police forms (Attachment K in original
Petition) show three attempts to contact the government. Obviously
there was no response. The gun was destroyed more than one year prior
to indictment of Petitioner and nearly 18 months before Petitioner's
arrest. Petitioner therefore had no opportunity to examine the weapon.
The prosecution was obligated to preserve the weapon especially after
the Petitioner became a suspect in January of 1998.

Just as it would undermine Brady [to] . . . allow the prosecutor to
tell the investigators not to give him certain materials unless he
asked for them, (**US v. Blanco**, **392 F3d. 388 [9th. Cir. 2004]**), it
would equally undermine Brady for a prosecutor to direct his investig-
ator to perform an investigation and then fail to discover the
investigation's full results. (**US v. Wood**, **57 F3d. 733, 737 [9th. Cir.
1995]**). Incomplete disclosure does not discharge the prosecutor's
Brady duty. (See **Benn v. Lambert**, **283 F3d. 1054-60 [9th. Cir. 2002]**).
This extension of **Brady** is supported by other Circuit Courts.

In extending the Brady duty to search for evidence, the 5th Circuit
framed the matter as one of incentive for the government, arguing that
without the extension "we would be inviting and placing a premium on
conduct unworthy of the U.S. Government." (**US v. Auten**, **632 F2d. 478,
481 [5th. Cir. 1980]**).

The 7th Circuit has sounded a similar note, warning that "a prosecu-
tor's office cannot get around Brady by keeping itself in ignorance,

or compartmentalizing about different aspects of a case." **(Carey v. Duckworth**, 738 F2d. 875, 878 [7th. Cir. 1984]).

The Court's willingness to insist on an affirmative duty of inquiry may stem from a sense that an inaccurate conviction based on a government failure to turn over an easily turned rock is essentially as offensive as one based on government non—disclosure. **(Calley v. Calloway**, 519 F2d. 184, 223 [5th. Cir. 1975] [en banc]).

In addition, a prosecutor's obligation to disclose exculpatory evidence does not end once the last witness at trial is called, but instead continues throughout the proceedings. **(Thomas v. Goldsmith, 979 F2d. 746, 749-50 [9th. Cir. 1992] [prosecutor has on-going duty to disclose that extends to habeas proceeding]).** "A prosecutor's decision not to preserve or turn over exculpatory material before trial, during trial or after conviction is a violation of due process under Brady." **(Broam v. Bogan**, 320 F3d. 1023, 1030 [9th. Cir. 2003]).

The heart of the holding in Brady is the prosecution's suppression of evidence in the face of a defense production request, where the evidence is favourable to the accused and is material either to guilt or punishment. Important then are (a) suppression by the prosecution, after a request by the defense, (b) the evidence's favourable character for the defense, and (c) the materiality of the evidence. **(Moore v.Illinois**, 408 US 786, 794-95 [1972]). This test is not dependent on bad faith.

Evidence is material "if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceedings would have been different." **(Kyles [supra]).** "The reasonable probability standard is not the same as, and should not be confused with, a requirement that a defendant prove by a preponderance of the evidence that but for error things would have been different." (See **US v. Dominguez-Benitez**, 542 US 74, 83 n.9 [2004]). Materiality, therefore "does not require a showing that the defendant would have been acquitted had the suppressed evidence been disclosed, or that

disclosure of the suppressed evidence would have reduced the quantum of the inculpatory evidence below that required to convict the defendant." **(Silva [supra]** at 986). Materiality is not a sufficiency of the evidence test." **(Kyles [supra]).**

The 9th Circuit has observed that, in contrast to a preponderance standard, the "reasonable probability test" represents a fairly low threshold. (**Riggs v. Fairman**, 399 F3d. 1179, 1183 [9th. Cir. 2005]). The inquiry should simply focus on whether the undisclosed evidence "could reasonably be taken to put the whole case in such a different light as to to undermine confidence in the verdict." (**Kyles [supra] and Bagley [supra]).**

There is no question that the value of the fingerprints in the instant case, goes way beyond the threshold set by the aforementioned citations, and elevates the materiality of the gun as exculpatory evidence in the instant case. Had the trial jury or the Appellate Court been aware of this, there is a high probability that the verdicts would be different.

Finally, "[o]nce the materiality of the suppressed evidence is established, no further harmless error analysis is necessary, even in the context of habeas review: when the government has suppressed material evidence favourable to the defendant, the conviction must be set aside." **(Silva [supra] at 988 citing Kyles [supra]).**

## II
### FBI AGENTS' REPORTS OF PETITIONER'S STATEMENTS SHOULD HAVE BEEN SUPPRESSED.

FBI Agents Loven and Muxworthy testified at trial that they had interviewed Petitioner who admitted to them that he had given Nebiolo a gun. Petitioner has constantly denied that he made this statement.

According to agent Loven, this "confession" was made twice in January 1998. (See **Attachments 3 & 4**), yet, in spite of this, Petitioner not only was asked to do a polygraph test but was not arrested until three

8

years later, after the destruction of the weapon in question.

Again, in April, 2001, Agent Muxworthy claimed that Petitioner made a similar statement after his arrest. Petitioner again denies this. Petitioner was never given a statement to read and adopt as own by signing it.

The encyclopedic American Jurisprudence §724 states that if a policeman writes a confession for an accused, that confession must be read and signed by the accused and adopted as his own, otherwise the statement is inadmissible.

The prosecutor, in his opposition memorandum (ROB pp.11 lines 17-22), cites **US v. Smith—Baltiher**, **424 F3d. 913, 925—26 (9th. Cir.2005)** which rejects this claim by citing **US v. Coades**, **549 F2d. 1303 (9th. Cir. 1977)**.

**Coades**, on the other hand, cites **US v. Harris**, **543 F2d. 1247, 1252-53 (9th. Cir. 1976)** which holds that the original notes, especially relating to an FBI interview with the accused, must be preserved.

In the instant case, no handwritten original notes were presented as discovery. In fact, Agent Muxworthy never took any notes as he never interviewed the Petitioner at any time. While the Petitioner was being interviewed in the back seat of the car during the ride to San Diego, Agent Muxworthy was driving the car at high speed. Not only was it impossible for Agent Muxworthy to take notes, it was impossible for him to hear everything said by Agent Iannarelli and the Petitioner.

The **Harris (supra)** decision was based on **US v. Harrison**, **524 F2d. 421 (9th. Cir. 1975)** in which the court held that that the rough notes of FBI interviews fall within the category of potentially discoverable material, and are required to be preserved and produced by the government.

Trial counsel was ineffectual in not moving to suppress the FBI agents' statements due to government failure to produce the agents'

9

original notes and the failure of Muxworthy, who testified at trial,
to take notes.

Prosecutorial misconduct must also be considered by not preserving or
presenting any of these notes as part of discovery.

### III

### INEFFECTUAL ASSISTANCE OF COUNSEL MUST STAND DUE TO COUNSEL'S FAILURE TO MEET STANDARDS SET BY THE SIXTH AMENDMENT.

Petitioner has already listed a litany of errors made by trial counsel
(Mr. Turner). The prosecutor has attempted to nullify these errors,
stating that they were reasoned, strategic decisions and fell within
the definition of effective assistance of counsel as mandated by the
VIth Amendment. (ROB pp.8 lines 3, 4, 16). The prosecutor continues by
quoting the two-part test in Strickland. (**Strickland v. Washington**,
**466 US 668, 687 [1984]**). The prosecutor states that one must enquire
"whether the choices made by defense counsel were reasonable." (ROB
pp.8 line 23).

It would be a waste of the Court's time to go through all the grounds
discussed in the initial petition. However, one or two of these
complaints deserve a second look because they illustrate the lack of
effectiveness of trial counsel's so—called tactics.

Allowing the photograph of the gun to be admitted as evidence was a
huge mistake, more so if he knew of the fingerprints, as already
discussed. If he did not know of the fingerprints he still could have
challenged the prosecutor's statement that the gun had no exculpatory
value. The prosecutor makes this statement without any evidentiary
support, merely to cover his own neglect in not preserving the gun.
Not only did the Petitioner not examine the gun, neither did the
prosecutor. How could he therefore state that the gun had no
exculpatory value?

By allowing the foreign videotapes (taped six years previously) into
evidence was another act of ineffective counsel. This was a direct
deprivation of the Petitioner's confrontational rights as guaranteed
by the VIth Amendment. **(Crawford v. Washington, 541 US 36 [2004])**.

By failing to depose certain witnesses, counsel deprived the
Petitioner of exculpatory evidence that could have changed the course
of the trial. Four witnesses mentioned were Mary Behr, Ruth Gladstone,
Rubin Stuppel and Beth Brown, but there were others. (See **Attachments
6, 7, 8, 9**.)

According to the prosecutor these were reasoned and strategic
decisions. Petitioner contends that these decisions were neither
reasoned nor strategic.

The videotapes of foreign depositions were initially allowed in as
evidence in order to save time as Petitioner wanted a speedy trial, to
which the prosecutor objected. This reason became moot when the court
dismissed the Petitioner's attorney (Mr. Hedderman) and reappointed
Mr. Turner to act as defense counsel. In spite of the fact that time
was no longer an issue, Mr. Turner allowed the order concerning the
videotapes, to stand. He knew that these videotapes were done six
years earlier without the Petitioner's involvement. He also knew that
these depositions could not help his client in any way, yet he allowed
them into evidence. The prosecutor claims that this was legitimate
trial tactics.

Petitioner also gave defense counsel a list of prospective witnesses.
These were not only character witnesses, but some of them had actual
knowledge of events associated with the crime. Defense counsel told
Petitioner to choose two character witnesses which Petitioner did, and
left it at that, leaving it up to Petitioner to inform these two
individuals (Ms. Giraldo and Mr. Italiane) as to when they should
appear in court.

Defense counsel did not make any reasonable decisions nor did he

choose any reasonable trial tactics. Rather, he abrogated his duties
as a defense counsel.

A defense counsel has a duty to make reasonable investigations or to
make a reasonable decision that makes particular investigations
unnecessary. "A lawyer who fails adequately to investigate, and to
introduce into evidence [information] that demonstrates his client's
factual innocence, or that raises sufficient doubts as to that
question to undermine confidence in the verdict, renders deficient
performance." (**Lord v. Wood**, 184 F3d. 1083, 1093 [9th. Cir. 1999]
quoting **Hart v. Gomez**, 174 F3d. 1067, 1070 [9th. Cir. 1999]). Failure
to investigate may in itself constitute ineffective assistance of
counsel. **(Tucker v.Ozmint**, 350 F3d. 433, 444 [4th. Cir. 2003]).

Although trial counsel is typically afforded leeway in making tactical
decisions regarding trial strategy, counsel cannot be said to have
made a tactical decision without first procuring the information
necessary to make such a decision. (See **Riley v Payne**, 352 F3d 1313,
1324 [9th Cir 2003][holding that, under clearly established Supreme
Court law, when defense counsel failed to contact a potential witness,
counsel could not "be presumed to have made an informed decision not
to call that person as a witness."]).

In the instant case, defense attorney made several such errors that
ended up being fatal to the Petitioner. By failing to call and speak
to the people on the videotaped depositions, he was unable to
determine whether they knew of any part that Petitioner may have
played in the commission of this crime, whether exculpatory or
inculpatory. If he had spoken to Mary Behr, who was one of those
deposed, counsel would have found a witness to the events that
unfolded in South Africa. A witness who had positive evidence that
Petitioner was not involved in this case. A witness whose testimony
supports Ronald Abel's affidavit, even though she testified against
Abel in South African courts. A witness who was employed by Abel as
his personal accountant at the time and was present when Abel was

conspiring with Nebiolo. (See **Attachment 6**). Mary Behr's important
statement along with the affidavits of other witnesses support the
Petitioner's claim of actual innocence.

According to Federal Habeas Corpus Practice and Procedure §21.2 Rules
of Evidence, a habeas corpus court is allowed to receive affidavits
and other hearsay documentary evidence in lieu of in court testimony
of the sort generally required in federal trials.

By not calling and speaking to these people, defense counsel could not
make an informed decision whether to admit these videotapes or not.

If counsel had spoken to the witnesses on Petitioner's list he would
have learned that Dr. Leslie Fayr Barkley (Petitioner's landlady at
the time of the crime), had seen the Petitioner's gun as he described
it, prior, to the theft of the weapon used in this case. (See
**Attachment 5**).

Counsel would have seen that much of the information that Petitioner
imparted to the FBI, over a period of time, came from sources other
than personal knowledge. (See **Attachment 7**).

Counsel would have found that the motive for this crime, suggested by
the prosecutor (that Petitioner sought revenge for his cousin Rubin
Stuppel) was false. (See **Attachment 8**).

By not contacting the people on the list, trial counsel was unable to
make an informed tactical decision. The testimony of some of these
witnesses could have changed the course of the trial. For example, the
prosecutor kept on harping about the Petitioner's "ever evolving
story." Witness testimony would have shown that this information came
to the Petitioner over the long period of time through sources other
than personal knowledge. Dr. Barkley has confirmed that Petitioner
owned his gun prior to its theft thus enhancing the exculpatory nature
of the gun.

Counsel did not even contact the two witnesses chosen by the

Petitioner.  Counsel spoke to them 30 seconds prior to their
appearance in court. (See **Attachment 10, 11**).

All this evidence shows the lack of interest and due diligence that
trial counsel had in the instant case. He failed to do even the most
basic of investigations. How could counsel make any reasonable
decisions without the knowledge of any facts?

"Ineffectiveness is generally clear in the context of complete failure
to investigate because counsel can hardly be said to have made a
strategic choice when he [sic] has not yet obtained the facts on which
such a decision should be made." (**Sanders v. Ratelle**, 21 F3d. 1446,
**1457 19th. Cir. 1994])**.

**IV**

**AFFIDAVITS AFFIRM EXCULPATORY EVIDENCE IN FAVOUR OF PETITIONER**.

An unrebutted affidavit stands as truth.

"Court of Appeals may not assume the truth of allegations in a
pleading which are contraindicated by affidavit.

"Where affidavits are directly conflicting on material points, it is
not possible for the District Judge to 'weigh' the affidavits in order
to resolve disputed issues, except in those rare cases where the facts
alleged in an affidavit are inherently incredible, and can be so
characterized solely by a reading of the affidavit, the District Judge
has no basis for a determination of incredibility."

(**Data Disc, Inc. v. Systems Tech. Assocs. Inc.,** 557 F2d. 1280 [9th.
**Cir. 1977])**. In **Taylor v. Portland Paramount Corp.,** 383 F2d. 634, 639
**(9th. Cir. 1967),** the court said that "we may not assume the truth of
allegations in a pleading which are contraindicated by affidavit."

## **CONCLUSION**

Petitioner has set forth numerous grounds for reversal in this case. Most important are the prosecutorial misconduct or neglect in failing to preserve evidence vital to the accused, and the ineffectiveness of defense counsel who showed a total lack if interest in the welfare of his client. Either of these two factors alone support the Petitioner who pleads respectfully that this Honorable Court grant his 28 U.S.C. §2255 or alternatively order an evidentiary hearing.

Dated this 14 day of August, 2009

Respectfully submitted,

Alfred Koonin

Petitioner/Defendant

Pro Se Litigant

1

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

1/8/98

Dr. ALFRED KOONIN, date of birth 1/6/39, tel. (310) 822-2094, 2315 Tahiti Way, Marina del Ray, California was advised as to the purpose of the interview and as to the identity of the interviewing agent. Assistant United States Attorney SHANE HARRIGAN was also present during the interview. No promises or guarantees of any type were made to Dr. KOONIN in exchange for his statement. KOONIN voluntarily provided the following information:

KOONIN was advised that the weapon which VALTER NEBIOLO used to attack SYDNEY KAHN on February 23, 1996 may possess his (KOONIN's) fingerprints on it. KOONIN responded to this prospect by stating that the weapon may have had his fingerprints on it because the weapon may have belonged to him. Specifically, he stated "quite possibly the gun did belong to me."

He continued by claiming that the weapon, (a .25 caliber "Raven Arms" handgun), had been given to him by a woman whom he had dated approximately ten years ago. He could not recall the woman's entire name but he knew that her first name was "DEBRA." DEBRA had given the weapon to KOONIN following the theft of some guns from KOONIN's residence approximately ten years ago.

KOONIN was advised that VALTER NEBIOLO, in a statement to the FBI, claimed that he (KOONIN) had given him the weapon while he (NEBIOLO) had been staying with KOONIN in Los Angeles. KOONIN replied that NEBIOLO was not telling the truth. KOONIN later advised that NEBIOLO had in fact told the truth and that he (KOONIN) had given NEBIOLO the weapon to take to San Diego.

KOONIN stated that approximately one month prior to NEBIOLO's arrival in Los Angeles, RONALD ABEL had contacted him from Cape Town. ABEL asked KOONIN if he still had the weapon at his house. KOONIN replied that he did possess the weapon.

Moreover, KOONIN indicated that during a trip to the United States several years ago, ABEL asked him if he (KOONIN) still had the gun. KOONIN replied that he did. ABEL asked KOONIN if he could borrow the weapon. KOONIN told ABEL that he could not. Instead, ABEL purchased a crowbar and took the

Investigation on _____   1/7/98    Los Angeles CA

at _____   1/8/98

File # Kyle A. Loven _____   Date dictated _____

by _____

0000158

FD-302a (Rev. 10-6-95)

2.

1~~~~~~~~~~~~~~~

Valter Nebiolo                          07/11/97          6

Continuation of FD-302 of
KAHN and explaining to NEBIOLO the "reason" why KAHN needed to be
"rubbed out." KOONIN stated that KAHN owed a lot of people money
and had run out on the debt. He stated with reference to
NEBIOLO's handgun request: "I'll see if I can get you something
else".

The two men then drove back to KOONIN's apartment.
NEBIOLO claimed that KOONIN left the apartment and returned a
short time later. He gave NEBIOLO a .25 "Raven Arms" handgun.
The weapon was in a holster according to NEBIOLO.

NEBIOLO took the weapon apart, examined it, and wiped
it clean of fingerprints. He claimed that he noticed one
fingerprint on the weapon. He left the fingerprint on the weapon
in order to throw off the police investigation. KOONIN asked
NEBIOLO if the weapon was all right. NEBIOLO replied that the
weapon would work

On February 23, 1996, NEBIOLO awoke at approximately
5:00 am. He got in his vehicle and drove to San Diego. He
claimed that he checked KAHN's business one last time. He then
drove to a beach and then to a coffee shop near KAHN's office
building.

He waited at the coffee shop until approximately 8:00
or 8:30 am. He then walked to a pay telephone and called KAHN's
office. A receptionist answered the telephone. NEBIOLO asked if
KAHN was at the office. The receptionist responded that he was
at the office. NEBIOLO then hung up the telephone.

NEBIOLO walked to his vehicle and retrieved the gun, a
hat and some sunglasses. He then walked around to the back of
the building. He checked the corridors in the office building as
he walked.

After a short walk, NEBIOLO reached KAHN's office
within the complex. He looked around the corridors and noticed
no one around. He saw KAHN sitting with his back towards the
window which looked out onto the corridor.

NEBIOLO took out the handgun and fired 4 rounds through
the glass in the direction of KAHN. NEBIOLO claimed that KAHN
was "jumping around" while he was shooting at him. NEBIOLO
claimed that he wanted KAHN to believe that he had escaped death.

Subsequent to the shooting, NEBIOLO dropped the weapon,

*3*

FD-302a (Rev. 10-6-95)



Dr. Alfred Koonin                          1/14/1987                2

Continuation of FD-302 of

crowbar with him to San Diego where he was going to "beat someone's brains out." KOONIN assumed that ABEL was planning to visit KAHN in San Diego since the two had had some business dealings while KAHN was living in South Africa.

KOONIN asserted that he had given VALTER NEBIOLO a "target pistol," which resembled a .357, upon NEBIOLO's arrival in Los Angeles. NEBIOLO took the weapon and traveled to San Diego the next day. According to KOONIN, he was nervous about giving the pistol to NEBIOLO knowing that NEBIOLO was traveling to San Diego. He claimed that SYDNEY KAHN's name was never mentioned but that he (KOONIN) had "put two and two together," because of ABEL's business problems with KAHN.

Upon NEBIOLO's return from San Diego, he advised KOONIN that the weapon was no good. KOONIN then gave NEBIOLO the "Raven Arms" pistol which ABEL had asked him about. NEBIOLO took the pistol to San Diego with him the next day.

Furthermore, KOONIN indicated that during a conversation with ABEL following NEBIOLO's arrest, ABEL advised KOONIN to testify at Grand Jury that NEBIOLO had come to California on business rather than coming to California on business for Mr. Abel.

*4*

FD-302a (Rev. 10-6-95)



Dr. Alfred J. Koonin                    1/16/98              3

Continuation of FD-302 of

He returned to KOONIN's residence two days later and advised
KOONIN that the weapon which he had given him was "too big."
NEBIOLO then asked KOONIN:  "Do you have anything smaller?"

KOONIN showed NEBIOLO a .25 caliber, "Raven Arms"
handgun which he had kept in his closet.  NEBIOLO seemed very
interested in this weapon according to KOONIN.  KOONIN claimed
that he then took the .25 caliber handgun and left the residence.

KOONIN drove to a telephone booth and called ABEL at
approximately 9:00 pm on February 22, 1996.  He advised ABEL that
NEBIOLO wanted to use the .25 caliber handgun.  ABEL assured
KOONIN that NEBIOLO's intentions were to "intimidate and scare"
KAHN.  ABEL added:  "There'll be no harm."

Subsequent to returning to his residence, KOONIN gave
the .25 caliber handgun to NEBIOLO.  KOONIN claimed that he gave
the weapon to NEBIOLO because he "never thought killing someone
was in ABEL."  He also believed that ABEL would not have had KAHN
killed because he could not then recover any money from KAHN.
KOONIN believed that NEBIOLO would scare KAHN and then come back
to Los Angeles with some money.

After the attack on KAHN had occurred, KOONIN received
a telephone call from ABEL on either the 24th or the 25th of
February.  ABEL asked KOONIN if NEBIOLO had made his flight out
of Los Angeles.  KOONIN responded that "he (NEBIOLO) is going to
be a permanent resident of California."

During a second telephone call to KOONIN, ABEL was
advised as to the details of what had happened to NEBIOLO.  ABEL
responded by stating:  "Oh God, I'm in deep shit."

According to KOONIN, he threw the .357 caliber handgun
away some time in July of 1996.  He also claimed that he would
take a polygraph examination with respect to the veracity of his
statement.

0000163

Leslie F. Barkley, Ph.D.
425 Shirley Place
#4
Beverly Hills, CA 90212
(310) 277-1131


To Whom It May Concern;

Alfred Koonin, M.D. was my tenant at Ophir Drive, Penthouse D in Westwood, CA from about 1992 to 1996. During this period of time, I had no trouble with him and he paid his rent in a timely manner.

I had an opportunity to go by to check on my condominium and saw Dr. Koonin shortly after he moved in early 1992. The apartment appeared to be in good repair and was decorated modestly and clean. There was a large screen in the living room for Dr. Koonin's projection TV system, a table in the dining area; the bedroom contained a bed, book case, chair and some paintings done by Dr. Koonin.

Dr. Koonin showed me a gun that was sitting on the lap of a stuffed bear, which was sitting in a chair next to the bed. He indicated to me that it was broken and could not fire. I thought it was a prop, not a real gun. The gun was small and appeared to be light colored, dull silver or gray and it was obviously broken and unusable.

When Dr. Koonin went through his trial, I was frankly a little surprised that I was not called as a witness, as I had been his landlady and had seen and held the gun in question.

This is as much information as I can currently remember regarding the gun and I am reporting this information to the best of my recollection and ability.

Sincerely,

Leslie F. Barkley, Ph.D.

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _Los Angeles_    }

On _July 8, 2009_ before me, _Katalin Langianese, Notary Public_
<sub>Date</sub>                    <sub>Here Insert Name and Title of the Officer</sub>

personally appeared _Leslie F. Barkley_
                    <sub>Name(s) of Signer(s)</sub>

_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Katalin Langianese_
          <sub>Signature of Notary Public</sub>

```
KATALIN LANGIANESE
NOTARY PUBLIC - CALIFORNIA
COMMISSION # 1606006
LOS ANGELES COUNTY
My Comm. Exp. Sept. 12, 2009
```

Place Notary Seal Above

─────────────── **OPTIONAL** ───────────────

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

## Description of Attached Document

Title or Type of Document: _Affidavit_

Document Date: _July 8 2009_          Number of Pages: _1_

Signer(s) Other Than Named Above: _____

## Capacity(ies) Claimed by Signer(s)

Signer's Name: _Leslie F. Barkley_
☒ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

Signer Is Representing: _____
_____

Signer's Name: _____
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

Signer Is Representing: _____
_____

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5907   Reorder: Call Toll-Free 1-800-876-6827

6

—— Original Message ——
**From: M**      M. vere@btopenworld.com
**To:** bethmartinbrown@sbcglobal.net
**Sent:** Thursday, July 30, 2009 4:02 AM
**Subject:** Reporter Saga


Your Question Refers :


RJA..No idea where or how to get ahold of him.I moved to UK, where I originally come from, because, (in part ,) of this bit of BS. As far as I know he runs some debt collection agency in Cape Town and married a Greek woman, his wife having divorced him, over all this, in the end.She is very much around I heard ,and has her own business ,and doing very well, but wants to know nothing of this any more, with good reason.Abel destroyed a lot of "us" in his despicable desperation leading up to this crime.

The Gun :

I know about the gun.. Because I got to work  one Wednesday in March and there was a bank envelope with returned cheque's inside -Trust Account cheques.One was for "Cash " of ZAR 4000.00 ( a lot of money back then) "Cash" is *illegal*  tender in trust Fund cheque's as all trust monies belong to clients. I made sure my finger prints did not go all over it!!! .It had been issued and cashed on the  previous Saturday-being a Jewish Law Practice we were not open on Saturday's ,and it was written in Abel's handwriting, him having gone into office on Saturday and raided my safe for the cheque book, which  the bank told me on a casual enquiry I made, he *himself* had cashed at bank counter ..I was very suspicious something was not right.I placed  it inside an envelope and hid it inside a Chubb Safe ( just in case Ronnie had stolen funds not his to take without permission, and in case clients fumed ,as he had  helped himself before, and got into a lot of trouble with Law Society and/ or the client ) .

A few days later RJA ( Abel) got a phone call from Alfie Koonin in a complete panic and hysterical flap asking "what the hell is going on," as the "guest" on a "business trip" that  Ronnie had asked him to allow to stay over had been arrested and police  were everywhere all over Alfie's home. *Alfie had NO idea what was going on*. Ronnie's secretary who took Alfie's call first, almost had a coronary and rushed upstairs to my floor and  into my private office, and blurted out what she knew ( she had been in on it and made all the phone calls and reservations, this being the 3rd or so plan to get to Khan who owed millions to people like Abel, so much so  they had 3 life policies they made him sign, that were held in one of my safe's  ) .Up until then I had NO idea either.I thought she may be laying it on a bit melodramatically ,but then I remembered that, without knowing his name , I had seen Nebiloa in the offices almost on a daily basis for about quite a while , and a lot of lunches.. long ones were gone off to. He was often around at 5pm closing time and left with Ronnie Abel.

2 or 3 weeks later Ronnie was in my office, with my door locked -by him, and he not only told my son ( who was my part time assistant) and I  a more or less blow by blow what had gone

6

down ,as it were ,he actually *drew* on paper a *diagram* of Sydney Khan's offices layout, and corridors where the gun and items of clothes had been dropped by Valter etc, explained how Nebiola had bolted and been chased by police etc...and ended with Ronnie saying Nebiola was "a ( his words not mine) fucking amateur who could die in jail for all he cared, Valter was on his own now because he failed and could prove nothing against Abel" ,and then he ranted off that he had drawn ZAR4000 for Nebiloa, in cash,( that cheque!! ) to buy a .45 gun in LA and "the idiot " had gone a bought a clapped out 2nd hand .22 caliber to save himself money, and Khan was still alive because there was "noways a .22 could penetrate the super thick glass windows with enough force to kill Khan" Quotes .The gun certainly did not go from SA as he could not board a plane with a gun, given security at airports.Hence him being given cash by Abel to purchase a high caliber one in LA.I know nothing at all about guns and calibers so can repeat only what Ronnie said.

 IF -and it is a big IF- it was an old gun of Alfie's then he stole it off Alfie without his knowledge, because when I asked Ronnie how Alfie could possibly be involved given he had then just had a huge heart attack and was recuperating at home, he told me Alfie knew *nothing*.Ronnie had merely asked him to put Nebiola up for 4 days as he was on "business" in LA for some "thigh reducing cellulite cream" (another of Abel's crazy business schemes which was hookum.) He was adamant he would never have involved Alfie, nor would Alfie had put Nebiola up had he known.Alfie being an upright citizen, and his then serious health issues etc.

Kyle Loven of FBI, who was in Cape Town with me and others for months, and knew Abel full well as he met him on many many occasions, Loven got removed ,for some ?? reason which remains a mystery, just as my "missing " evidence statements went a walking that were in Loven's and Larry Burns hands...So whilst I was not an eye witness -I had known Ronnie for 17 years at that time, and knew he was telling the truth and knew the gun used was not as planned, and that Alfie was oblivious of all.. until the police arrived (to cut a deal over Nebiola weirdly?? ) in 2001 .He only went down under some deal with Nebiola who lied about Alfie, possibly under threat, possibly because he was scared of repercussion from Abel ( the real one), or possibly to protect Abel again, as there may have been funds back in Italy for him from Abel.

This is an outrage of justice frankly.The 2 who ought to be in jail are Abel and Nebiola..there were others in the mess but it was primarily Abel using Nebiola.Abel wanted Khan dead so he could cash in those 3 policies as he was in financial troubles and Khan had not, since 1986 met his repayments to any of the millionaires who invested with him, until he did an overnight escape to San Diego without one word.Khan's cousin ,also Khan,was the head of justice and high courts for Cape and it was he and another guy whose name I forget,who questioned me in High Court offices..he wanted a swap of extradition as he had his own financial beef with his cousin Sydney, and wanted him returned to SA for trial there..He is, I hear, now a SA Chief Legal big wig for ANC.

Later - Abel naturally tried to refute he ever had this conversation with me ( he forgot my son had been there too , though my son lost interest after 10 minutes) , then he changed it by saying he was on this that and other pills due to stress and not responsible for what he said.He was not on sedatives or anything else when he told us.

6

Both my son and I got hauled in by FBI ,Interpol,SA Police Intelligence Dept and Larry Burns of your federal courts and more or less badgered to make statements having been told by some 63 "witnesses" to ask "her" since RJA "tells her everything " .Thanks to Abel and Nebiola I got my phone tapped, watched and followed 24/7 for over 2 years,shot at when police rushed me from court after evidence given in a ridiculous car chase.All paid for by Abel no doubt.His secretary Beth Karnasopolous ran away and hid to avoid-she knew more than I did I suspect, but had her own reasons for bolting- her husband was "wanted" and he had once been Abel's choice of the hired gun for Khan a few year previous to this mess.Plus she and her husband owed a lot of money to Abel along the way so she had divided loyalties even if she was outraged morally .Which is why it all landed on my plate.She told me she would not co-operate and then she vanished. But she knows Alfie is innocent an she knew the gun story as well.Not that even if she was ever found she would say so.Not in her interests to, or some such unethical climb down.

Look Larry Burns told me the federal Court would reward me $25,000 and Kyle Logan of FBI asked me where I wanted to live as FBI would consign me new face, new ID, and new country to live in... None of it happened nor did I expect it to.It was depended on RJA also being found guilty in San Diego court and I know and told them so often enough that RJA was in power position as a Jewish Lawyer in SA with mates in high places..they would not see him extradited if they could help it.. Plus the new laws of new SA had not even been passed at that time into reality.. It was all guess work and wishful thinking...RJA had to read foreign law books on extradition to find out legal process SA may face...... Nobody knew at the time how or even if ANC new  government would agree to extractions ..it was still all being hammered out.. Which should explain why RJA got off scot free...

Alfie  Background:

My youngest son fell across some website about innocent people in jail in USA and spotted  a ref to R Abel .He sent me the link.I had had no idea Alfie was in jail.I was stunned, and have tried since I found out to redress this diabolical fault of law and injustice. I managed to get in touch with Beth, and have remained so ever since-I do not know Alfie of course,never been to States-well not since I was about 12,  but I do know from Ronnie Abel- Alfie  is innocent of anything at all to do with Nebiola crimes and Khan.And given Abel's penchant for blaming everyone else ,I do believe him that Alfie was merely the free boarding house, who knew nothing whatsoever, for his own safety.Most of these folk grew up together as children and remained friends all their lives.Khan was a dodgy lawyer who got disbarred in  SA in 1980's, and opened a Video Distribution Company which they all invested a fortune in as Videos were to be new to SA, and they had  sole ( at the time) distribution in SA sewn up .This is the crux of the money issues they had with Khan, but Abel was a massive investor being super wealthy, and he wanted his capital back if not the interest etc. On the peripheral there was a gold smith of society fame, a rich accountant of note, and several other CEO types.But they did not plan things , so were left to one side by FBI and Larry Burns -who focused on Abel, who had threatened Khan with his life on several occasions, and Nebiola who had been caught running away from his botched job chased from San Diego to LA and apprehended at Alfie's home. The arrest  at his home,is Alfie's only "involvement" really...

Anyway that is  the background to money, and cheque's, and gun funding, etc.Hope it helps.

6

Alfie should be free.He should never have been arrested in first place let alone some 5 years after the crime .And only because there was something "unkosher" with Nebiola that prompted it , as he was then freed form his 15 years

I do not under any circumstance want my name/ names  in any news papers please.I spent years running away after threats were made via the back door.This mess ruined my health which was fragile even back then.I can do without the angst all over again.I am happy to oblige legally,  but keep my name out unless they ever want me in court -and even then ..........

 M Vere
73 Hilltop Gardens
Temple Hill
Dartford
Kent
UK
DA1 5JF

MY NAME IS RUTH GLADSTONE AND I WAS BORN IN SOUTH AFRICA BUT HAVE

LIVED IN AMERICA FOR THE LAST THIRTY YEARS.  I GREW UP IN CAPE TOWN

AS PART OF A SMALL CLOSE KNIT JEWISH COMMUNITY.  ALFRED J. KOONIN IS

A FRIEND AS WELL AS A RELATIVE  AND RONALD ABEL AND HIS WIFE WERE ALSO

FRIENDS.


AS RONALD ABEL WAS A WELL KNOWN CITIZEN IN CAPE TOWN IT WAS A BIG NEWS

STORY AND THE LOCAL NEWSPAPERS HAD MANY, MANY ACTICLES REGARDING THE CRIME

AND THE MANY SCHEMES THAT HE HAD TRIED TO PLAN.  THESE ARTICLES WOULD EITHER

BE MAILED OR FAXED TO ME BY FRIENDS IN CAPE TOWN.  MANY TIMES THESE HEADLINE

ARTICLES WERE UPDATED ON AN ALMOST WEEKLY BASIS ON AND OFF FOR A FEW YEARS

AFTER THIS CRIME HAPPENED.  I WOULD CALL ALFRED KOONIN AND EITHER FAX OR

READ HIM THE ARTICLES.  IT WAS MOST SURPRISING THAT I WAS NOT

CALLED UPON TO TESTIFY AT TRIAL ON AFRED KOONIN'S BEHALF, AS I AM SURE MY

TESTIMONY WOULD HAVE CLARIFIED HOW ALFRED KOONIN WAS AWARE OF CERTAIN

INFORMATION AND WHY THE AUTHORITIES THOUGHT HE WAS CHANGING HIS STORY.

EVERYONE WHO KNOWS ALFRED KOONIN IS EXTREMELY UPSET ABOUT WHAT HAS HAPPENED TO

HIM AND FEEL HE HAS BEEN GIVEN A VERY HARSH SENTENCE THROUGH NO FAULT OF HIS

OWN.


EXECUTED ON  8-10-2009  AT  WOODLAND HILLS, CALIFORNIA

*RUTH GLADSTONE*

State of California
County of LOS ANGELES
Subscribed and sworn to (or affirmed) before me
on this 10th day of AUGUST, 2009,
by RUTH GLADSTONE, personally known to
me or proved to me on the basis of satisfactory
evidence to be the person(s) who appeared before me

Signature X Casey



K. CASEY
Commission # 1709338
Notary Public - California
Los Angeles County
My Comm. Expires Dec 7, 2010



## TO WHOM IT MAY CONCERN

My name is Rubin Stuppel a Certified Public Accountant and was born in Cape Town South Africa. When I married in 1968 my wife and I moved into an apartment and our next door neighbours were Sydney and Marda Kahn and from that date we became close friends with our children growing up together. During that time I lent Sydney Kahn certain funds which he subsequently repaid in full. When the Kahn's left South Africa for America and when we emigrated to the United States we continued our friendship visiting them in San Diego on numerous occasions.

In regard to the trial of Alfred Koonin I should have been called as a witness to clarify that to the best of my knowledge Alfred Koonin did not know Sydney Kahn and that Sydney Kahn did not know Alfred Koonin.
Based on the above Alfred Koonin had no reason to be in contact with Sydney Kahn.

Signed this ___11th___ day of ___AuGusT___ 2009

Rubin Stuppel

# CALIFORNIA JURAT WITH AFFIANT STATEMENT

☒ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–5 to be completed only by document signer[s], *not* Notary)

_____     _____
Signature of Document Signer No. 1          Signature of Document Signer No. 2 (if any)

State of California

County of _Los Angeles_

Subscribed and sworn to (or affirmed) before me on this

_11_ day of _August_, 20 _09_, by
Date          Month          Year

(1)_Rubin Stuppel_,
Name of Signer

proved to me on the basis of satisfactory evidence
to be the person who appeared before me (.) (,)

(and

(2)_____,
Name of Signer

proved to me on the basis of satisfactory evidence
to be the person who appeared before me.)

Signature _Bryna S Hornstein_
Signature of Notary Public

BRYNA S. HORNSTEIN
Commission # 1831053
Notary Public - California
Los Angeles County
My Comm. Expires Jan 21, 2013

Place Notary Seal Above

──────── **OPTIONAL** ────────

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Further Description of Any Attached Document**

Title or Type of Document: _Letter_

Document Date: _8/11/09_    Number of Pages: _1_

Signer(s) Other Than Named Above: _none_

RIGHT THUMBPRINT
OF SIGNER #1
Top of thumb here

RIGHT THUMBPRINT
OF SIGNER #2
Top of thumb here

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org    Item #5910    Reorder: Call Toll-Free 1-800-876-6827

9

On Thursday, April 5, 2001 at approximately 3:45 p m I received a call from my fiancé, Alfred Koonin. I was relieved as I had been expecting a call from him for a couple of hours. He told me that he was with the FBI in San Diego. I thought that he was joking until he had me speak with another man who introduced himself over the phone to be Agent John Iannarelli. Agent Iannarelli told me that Dr. Koonin was with them in San Diego as a witness to a crime. I remember Alfie had told me about something that had happened several years before I knew him about somebody in South Africa wanted for a crime here and that he may be needed again as a witness if this person was extradited. So, when Agent Iannarelli told me that Alfie was there in San Diego as a witness, I believed him. At that moment, Agent Iannarelli was professional and polite. He told me that because it was later in the day that he would have to keep Alfie overnight, but then he would take him to the train station the next morning himself and I could pick him up at the L A train station the next day, a Friday afternoon. He even gave me his phone number. I asked Agent Iannarelli to be sure to have someone check Alfie's blood pressure in case he had not brought any of his medicine with him. He assured me he would and ended our conversation saying that he would take care of him and "Dr. Koonin could be a friend of mine."

On Friday, April 6, I waited to hear from Alfie regarding what time I should pick him up. When I had not heard from him by early afternoon, I called the number that Iannarelli had given me the day before. When I reached him, he acted as if he had not even spoken with me the day before. I asked about Alfie. Officiously, he read the charges against Alfie. I was dumbfounded and knew that they were not true. He became terse and gave me the number to the federal court and hung up. That was the last time any of us ever heard from Iannarelli.

The nightmare began that day and continues until the real truth is heard and Dr. Koonin is freed.

*Beth Brown*                    8/5/09

Beth Brown
5420 Sylmar Ave #215
Sherman Oaks, CA 91401
818-785-2807

# CALIFORNIA ALL-PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

9

State of California

County of _Los Angeles_

On _August 5, 2009_ before me, _Ola M. Kaplan, notary public_ .
(Here insert name and title of the officer)

personally appeared _Beth M. Brown_ .

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

OLA M. KAPLAN
Commission # 1641312
Notary Public - California
Los Angeles County
My Comm. Expires Jan 28, 2010

Signature of Notary Public

(Notary Seal)

---

## ADDITIONAL OPTIONAL INFORMATION

### DESCRIPTION OF THE ATTACHED DOCUMENT

_Affadavit_
(Title or description of attached document)

(Title or description of attached document continued)

Number of Pages **1** Document Date **8/5/09**

(Additional information)

### CAPACITY CLAIMED BY THE SIGNER
- ☒ Individual(s)
- ☐ Corporate Officer

_____
(Title)
- ☐ Partner(s)
- ☐ Attorney-in-Fact
- ☐ Trustee(s)
- ☐ Other _____

### INSTRUCTIONS FOR COMPLETING THIS FORM

*Any acknowledgment completed in California must contain verbiage exactly as appears above in the notary section or a separate acknowledgment form must be properly completed and attached to that document. The only exception is if a document is to be recorded outside of California. In such instances, any alternative acknowledgment verbiage as may be printed on such a document so long as the verbiage does not require the notary to do something that is illegal for a notary in California (i.e. certifying the authorized capacity of the signer). Please check the document carefully for proper notarial wording and attach this form if required.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they, is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  ❖ Indicate title or type of attached document, number of pages and date.
  ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document

2008 Version CAPA v12.10.07 800-873-9865 www.NotaryClasses.com

**FROM THE DESK OF**
**IVETTE GIRALDO**

My name is Ivette Giraldo and I met Dr. Alfred Koonin at my marketing office in Beverly Hills in 1994. Dr. Koonin became a broker for Dr. Frome who owned a beauty product called *SmoothContours*. Dr. Koonin was very instrumental in our company purchasing the product line and the rights to market *SmoothContours*. Dr. Koonin also made efforts in finding a distributor for us in South Africa and I was aware that he contacted his childhood friend Ronnie Abel for the distribution of this product. There were various phone conversations and faxes between Dr. Koonin and Mr. Abel in regards to the *SmoothContours* distribution, but in the end Mr. Abel did not deliver a distribution contract for us, thus we terminated this contact as a viable possibility for a distribution deal in South Africa.

When Dr. Koonin was put on trial for a crime that he never committed, I volunteered to testify on behalf of Dr. Koonin. His counsel was very ineffective. Mr. Turner never contacted me prior to my testimony date. I only spoke to Mr. Turner for about 30 seconds before my testimony and this is what Mr. Turner told me.

"I will be asking questions as if I were the prosecutor, and you just answer those questions." And that was it.

When I testified, Mr. Turner never asked me questions that would have clarified the reasons for the calls to South Africa with Mr. Abel. Some of those calls occurred from my office and it was all in reference to the *SmoothContours* Cellulite thigh cream. Mr. Turner was a very ineffective attorney and actually did harm to Dr. Koonin because he never defended him in the proper manner. I actually caught Mr. Turner falling asleep while Dr. Koonin was on trial. This individual's license should be cancelled. He is a disgrace to the legal system.

On another note in regards to the jury, I was in the ladies' restroom at the court when various female jurists for Dr. Koonin's trial walked into the restroom. They were having a conversation with each other where they stated that they will arrive at a quick verdict even if it means voting for a guilty verdict. The two females said that they wanted to be home for the weekend and did not want to deal with this situation.

I told Mr. Turner of this incident and he did nothing. I am not an attorney but I was a witness to Dr. Koonin's trial and I overheard this discussion from these jurists and when I reported this incident nobody cared.

This proof alone shows that Mr. Turner was a very ineffective counsel at Dr. Koonin's trial and should be disbarred permanently.

Thank you,

Ivette Giraldo

*10*

# CALIFORNIA JURAT WITH AFFIANT STATEMENT

☑ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–5 to be completed only by document signer[s], *not* Notary)

_____     _____
Signature of Document Signer No. 1     Signature of Document Signer No. 2 (if any)

State of California

County of _Los Angeles_

Subscribed and sworn to (or affirmed) before me on this

__10th__ day of __August__, 20 __09__, by
   Date            Month                      Year

(1) ___Ivette Giraldo___,
                Name of Signer

proved to me on the basis of satisfactory evidence
to be the person who appeared before me (.) (,)

                  (and

(2) _____
                Name of Signer

proved to me on the basis of satisfactory evidence
to be the person who appeared before me.)

Signature _____
                        Signature of Notary Public

**KRISTINA SIOJO**
Commission # 1777845
Notary Public - California
Los Angeles County
My Comm. Expires Nov 3, 2011

Place Notary Seal Above

──────────── **OPTIONAL** ────────────

*Though the information below is not required by law, it may prove
valuable to persons relying on the document and could prevent
fraudulent removal and reattachment of this form to another document.*

**Further Description of Any Attached Document**

Title or Type of Document:_____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

| RIGHT THUMBPRINT OF SIGNER #1 | RIGHT THUMBPRINT OF SIGNER #2 |
|---|---|
| Top of thumb here | Top of thumb here |

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5910   Reorder: Call Toll-Free 1-800-876-6827

This is a plea for Justice in the case of Dr. Alfred J. Koonin, who, in my opinion, was wrongfully convicted by dubious means. My name is Frank Lane Italiane, a witness in this case, where my testimony was blocked by the defendant's own attorney, Paul Turner. I have followed this case from the start of the alleged crime to present day. My knowledge of this case civilly and morally obligates me to help turn this wrongful conviction of an innocent man.

It is important to point out that if I was on the jury of this case, I, too, would have voted for conviction of Dr. Koonin because the jury was mislead and persuaded by prosecutorial misconduct and gross negligence and incompetence by Koonin's own attorney that supported and did not oppose, even once, the prosecution's arguments. Dr. Koonin did not have a change of justice in this case. This is just not right in our great country.

I and many other good citizens oppose this conviction based on irrefutable evidence that must be considered by the court for the plea for a new trial or dismissal of this case:

   1. Further, I was a key witness in the trial who was not given the opportunity to support Dr. Koonin's innocence by the incompetence of Dr. Koonin's attorney, Paul Turner. When I asked for guidance by Dr. Koonin's attorney in preparing to witness in the trial his only advice to me was to "blurt out that Dr. Koonin was innocent."
   I was in shock and disbelief when Paul Turner asked me what I thought he should do in the case. As I am not a lawyer, at first I thought he was kidding. To my horror he was not. Dr. Koonin's attorney, Paul Turner did not prepare me to respond in any matter of substance in this case, contributing to the outcome. As far as I am concerned, Dr. Koonin had two prosecutors in this case, one of them his own consul.

   2. Also, I was told with intimidation that I was going to be fully investigated because of my agreeing to witness on behalf of Dr. Koonin. Further, I resent the ethic slur made against me and my Italian heritage by prosecutor Harrigan by trying to associate the assassin with me, in his line of questioning because of our Italian heritage, in his attempt to further mislead the jury. When I said "so help me God" in agreement with my oath to tell the truth, apparently I upset Harrigan by using the word "God", provoking further attack on my character in front of the jury. Did Paul Turner object to any of this abuse? **Not once.**

   3. I was also a witness in identifying the said gun used in Nebiolo's testimony, by showing a 2x3 ft. blown up photograph of a gun that was similar to, but definitely **not**, the non-working gun that Dr. Koonin owned. Dr. Koonin had a non-working .22 and the gun that Nebiolo is supposed to have used was a .25 Raven Arms. I also saw the replica show gun (Dirty Harry .44 magnum) in Dr. Koonin's apartment. The blown up photograph of a gun was a misrepresentation of evidence in my opinion and the actual evidence should have been used.

   To consider that no ballistics tests were ever done on the gun to prove if the gun destroyed was the gun that had been used to shoot Kahn shows further ambiguity and further evidence to dismiss this case.

Legal counsel has advised me that Dr. Koonin has fallen pray to the jury being mislead and persuaded by prosecutorial misconduct and gross negligence and incompetence by Koonin's own attorney. Please provide the opportunity to help our system of justice work. An innocent man's life is at stake and our system of justice is in question by this gross injustice.

Under penalty of perjury, I state this statement is of fact.
Frank Lane Italiane

X _Jan Ngo_ 8/11/09

JAMES NGO
Commission # 1853496
Notary Public - California
Orange County
My Comm. Expires Jun 9, 2013

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _Orange_ }

On _August 11 2009_ before me, _James Ngo , Notary Public_,
　　　　　Date　　　　　　　　　　　Here Insert Name and Title of the Officer

personally appeared _Frank Lane Italiano , Jr_
　　　　　　　　　　　　　Name(s) of Signer(s)

_____,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

**JAMES NGO**
Commission # 1853496
Notary Public - California
Orange County
My Comm. Expires Jun 9, 2013

Place Notary Seal and/or Stamp Above

Signature: _____
　　　　　　　　Signature of Notary Public

──────── **OPTIONAL** ────────

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: _Statement of Fact_

Document Date: _8/11/09_　　　　　　Number of Pages: _1_

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name:_____

☐ Corporate Officer — Title(s): _____

☐ Individual

☐ Partner — ☐ Limited ☐ General

☐ Attorney in Fact

☐ Trustee

☐ Guardian or Conservator

☐ Other: _____

Signer Is Representing: _____

| RIGHT THUMBPRINT OF SIGNER |
| --- |
| Top of thumb here |

Signer's Name: _____

☐ Corporate Officer — Title(s): _____

☐ Individual

☐ Partner — ☐ Limited ☐ General

☐ Attorney in Fact

☐ Trustee

☐ Guardian or Conservator

☐ Other: _____

Signer Is Representing: _____

| RIGHT THUMBPRINT OF SIGNER |
| --- |
| Top of thumb here |

© 2008 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org    Item #5907  Reorder: Call Toll-Free 1-800-876-6827

## CERTIFICATE OF SERVICE

I, __Alfred Koonin  76477-198__ , hereby certify that I have served a true and correct copy of the following document(s) entitled;

Petitioner's Reply and Memorandum of Points and Authorities
in Response to United States' Opposition to Defendant's
Motion Pursuant to 28 U.S.C. §2255

[which is considered filed/served at the moment it was delivered to prison authorities for mailing as provided for in <u>Houston v. Lack</u>, 487 U.S. 266, 101 L.Ed.2d 245 (1988)] to the following listed parties/persons by placing the above described materials in a sealed envelope affixed with the appropriate pre-paid first-class United States postage to:

Clerk of the Court
U.S. District Court
Southern District of California
880 Front Street, Suite 4290
San Diego, CA 92101-8900

and deposited same with the prison authorities acting as agents for the United States Postal Service here at the Federal Correctional Institution (Low) in Lompoc, California, on this _____ day of _____, 20_____.

Pursuant to Title 28, United States Code section 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on this the _*14*_ day of _*August*_ , 20_____.

_____
Sign*ture*

Print Name:  Alfred Koonin
Register Number # 76477-198
Federal Correctional Institution-Lompoc
3600 Guard Road, Lompoc, CA 93436-2705
No Telephone/Fax/E-Mail Available